Case 2:12-cv-02873-EEF-KWR   Document 97-2   Filed 03/11/14   Page 1 of 33

WILLIAM JAYSON WALLER                                    July 29, 2013
GRICE vs. ISI ALARMS NC                                            1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CYNTHIA B. GRICE,                )   Civil action No. 12-2873
                                 )
              Plaintiff,         )
                                 )   Magistrate: Karen Wells Roby
      vs.                        )
                                 )
ISI ALARMS NC, INC., and         )
Trans Union, LLC,                )
                                 )
                                 )
              Defendants.        )
_____    )


DEPOSITION OF WILLIAM JAYSON WALLER

(Taken by Plaintiff)

Charlotte, North Carolina

Monday, July 29, 2013



WILLIAM JAYSON WALLER
GRICE vs. ISI ALARMS NC

July 29, 2013
2

EXAMINATIONS

PAGE

William Jayson Waller

By Mr. Michaud . . . . . . . . . . . . . . . 4
By Mr. Newkirk . . . . . . . . . . . . . . . 54
By Mr. Michaud . . . . . . . . . . . . . . . 58

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Monitoring agreement Schedule Protection | 16 |
| 2 | Schedule protection | 20 |
| 3 | Monitoring agreement | 28 |
| 4 | Complaints | 33 |
| 5 | Letter | 34 |
| 6 | IP address | 41 |
| 7 | Letter | 41 |
| 8 | Responses | 49 |



Case 2:12-cv-02873-EEF-KWR  Document 97-2  Filed 03/11/14  Page 3 of 33

WILLIAM JAYSON WALLER                      July 29, 2013
GRICE vs. ISI ALARMS NC                                    3

```
 1                          APPEARANCES

 2


 3   On behalf of the Plaintiff:

 4        MARC R. MICHAUD, ESQ.
          Patrick Miller, LLC
 5        Suite 1680
          400 Poydras Street
 6        New Orleans, Louisiana 70130
          (504)680-4318
 7        mmichaud@patrickmillerlaw.com.com

 8


 9   On behalf of the Defendant:

10        ROBERT B. NEWKIRK III, ESQ.
          Newkirk Law Office, P.A.
11        Suite E
          19810 W. Catawba Ave, Suite E
12        Cornelius, North Carolina 28031
          (704)892-5898
13        robert@newkirklawoffice.com

14


15        DEPOSITION OF WILLIAM JAYSON WALLER, a witness called

16   on behalf of plaintiff, before Justin Davis, Notary Public

17   in and for the State of North Carolina, taken at the Law

18   Office of Newkirk, 19810 W. Catawba Avenue, Cornelius,

19   North Carolina, on July 29, 2013, commencing at 12:45 p.m.

20

21

22

23

24

25
```



Case 2:12-cv-02873-EEF-KWR   Document 97-2   Filed 03/11/14   Page 4 of 33

WILLIAM JAYSON WALLER                                    July 29, 2013
GRICE vs. ISI ALARMS NC                                              4

1                    P R O C E E D I N G S

2                   WILLIAM JAYSON WALLER,

3         having been duly sworn, testifies as follows:

4                        EXAMINATION

5    BY MR. MICHAUD:

6         Q.     Good afternoon.  Please state your full name

7    for the record.

8         A.     William Jayson Waller.

9         Q.     What's your address?

10         A.     Attleboro Place, Mooresville North Carolina,

11    28117.

12         Q.     Have you ever had your deposition taken before?

13         A.     Yes.

14         Q.     How long ago?

15         A.     Two months ago.

16         Q.     For what purpose?

17         A.     Lawsuit for ISI alarms for telemarketing.

18         Q.     In your capacity as CEO of ISI?

19         A.     Yes.

20         Q.     How many times have you had your deposition

21    taken?

22         A.     This would be number three.

23         Q.     The other one was also for ISI related?

24         A.     Car accident when I was like 17.

25         Q.     I'm going to ask you questions.  And I actually



WILLIAM JAYSON WALLER                                  July 29, 2013
GRICE vs. ISI ALARMS NC                                        5

1   have a little bit of an ear infection, so if I don't hear

2   you --

3       A.      I'll speak up.

4       Q.      Please answer yes or no, so the court reporter

5   can understand as opposed to uh-huh or uh-uh or shaking

6   your head.

7       A.      Okay.

8       Q.      Have you taken any medication today that would

9   otherwise impair your ability to give truthful answers

10  today?

11      A.      No.

12      Q.      Could you please state your current occupation?

13      A.      I'm a chief operating officer for Power Home

14  Technologies.

15      Q.      Before you started at Power Home Technologies,

16  what did you do?

17      A.      I was chief executive officer -- I was owner of

18  ISI Alarms, Inc.

19      Q.      What is or was ISI Alarms, Inc.?

20      A.      Home security provider.

21      Q.      What exactly did you do?  What exactly did it

22  do?

23      A.      Installed home security systems for folks,

24  whether they wanted Life Alert or normal security systems.

25      Q.      What's Life Alert?



1      A.      Like I've fallen and can't get up.

2      Q.      okay, sure.  Alarm systems, the noise?

3      A.      Home security systems; right.

4      Q.      Can you just describe your business model at

5   ISI?

6      A.      We have door knockers, we have flyers, yellow

7   page ads, telemarketing.  We also get referrals and lead

8   agents, other vendors that sell deals to us that we

9   install.

10      Q.      Can you describe that process?

11      A.      Somebody who is a subdealer for us that sells

12   the system, we are the install company.  So they might have

13   door knockers or they might telemarket and they get

14   interest and then we send out a technician to put it in.

15      Q.      Where do you get your products from?

16      A.      ISI bought their products from Honeywell.

17      Q.      Do you also do monitoring services?  When I say

18   -- forgive me for a second, if you will.  When I say, "Do

19   you," I'm presuming we are speaking about ISI, even though

20   I understand the current situation.  So when I say, do you

21   also do monitoring service, I mean ISI.

22      A.      ISI did not.  We sold the paper.

23      Q.      So would you execute a contract for monitoring

24   service, and then sell that contract to somebody?

25      A.      Correct.

1    Q.    Can you describe that process, meaning, is it a

2    preordained situation whereby two years might be "X" amount

3    of dollars per month, five years might be "X" amount of

4    dollars per month?

5    A.    We sign someone up for $35 a month on a

6    36-month contract.  We would sell it to Monitronics.  They

7    would pay us most of that up front, assuming most customers

8    stay 8 to 10 years.  We have to guarantee that contract for

9    12 months or they charge us back, which means that we have

10   to replace it to equal value.  We buy the equipment

11   wholesale and pay an installer, sales rep, our office, keep

12   the lights on all to create that system.

13   Q.    Are the installers independent contractors or

14   are they employees?

15   A.    Most were employees, some are independent

16   contractors.

17   Q.    Is this something that they would require to be

18   licensed in whatever state they were in?

19   A.    Most states do, some do not.

20   Q.    How about in Louisiana?

21   A.    Yes.

22   Q.    How did you arrange for licensing or how did

23   you manage the licensing aspects for your installers?

24   A.    We had a licensing department that would obtain

25   a license holder and then hire technicians that had to get



WILLIAM JAYSON WALLER
GRICE vs. ISI ALARMS NC

July 29, 2013
8

1    licensed under them.

2        Q.    Do you have like training or educational

3    programs type of thing for that?

4        A.    We dealt with a company called -- it's a

5    licensing company, I don't remember the name offhand, that

6    would give us the right direction.  Hey, to do business in

7    this state, you got to have this license.  So then we would

8    obtain someone who has his license, make them an employee.

9            MR. NEWKIRK:  We forgot to add the standard

10           stip that all objections are preserved except as to

11           form.

12           MR. MICHAUD:  That's fine.

13       (Whereupon, discussion had off the record.)

14   BY MR. MICHAUD:

15       Q.    We were just talking about training programs

16   for installers and whatnot.

17           Do you have any sort of standard training

18   regiment for new employees?

19       A.    We did.  I mean, different positions that we

20   hire for.  We do a background check and they got to get

21   licensed and everything to work here.

22       Q.    When you purchased leads from other companies

23   -- well, let's just say this, how many different companies

24   did you purchase leads from?

25       A.    I don't know.  I had people manage that.  Over

1    caught wind of it and apparently knew nothing.  In this

2    case, I believe we would let them out without penalty.

3    I'll have this info from sent over.  I will also have them

4    pull the customer and send it over.  I'll be sure every

5    week these come over.  This was a miscommunication on our

6    part, but I'll have it corrected.  Thanks."

7         Q.    Were you aware of that E-mail?

8         A.    No, I wasn't.

9         Q.    Are you copied on it there?

10        A.    No, I'm not.

11        Q.    All right.  I'm going to hand you that.  It's

12   kind of what I was looking for earlier.  Do you recognize

13   that?

14        A.    Yep.

15        Q.    Can you compare it to Exhibit 1?

16        A.    It's got a social on it.

17        Q.    Can you identify it for me?

18        A.    Read the social?

19        Q.    No, just identify what it is?

20        A.    It's the alarm monitoring agreement, and it's

21   the version that we would have sent to Monitronics.

22        Q.    You said it had the Social Security number

23   added to it?

24        A.    Yes.

25        Q.    That is something you would have done after you

WILLIAM JAYSON WALLER
GRICE vs. ISI ALARMS NC

1  pulled her credit?

2      A.     We pull the credit, then do the install.  So we

3  pull the credit when we get the date of birth and

4  everything from the customer, pull the credit, send the

5  technician out.  They fill out the contract, they put the

6  social on it if they want to.  If they don't, which we

7  recommend that they don't, when we print the report and

8  mail it with he contract to Monitronics, it's put on there.

9      Q.     All right.  I'm going to put that as Exhibit 3,

10  just that one piece of paper.

11             (Exhibit 3 marked for identification.)

12  BY MR. MICHAUD:

13      Q.     If a customer declines to put his Social

14  Security number on there, why would you put it on there

15  afterwards?

16      A.     Well, we mail it to Monitronics.  They are

17  authorizing us to do what we call a credit check or utility

18  check to verify that they have a 600 beacon or above to get

19  the alarm system.  They must be the homeowner.  We also do

20  a deed check before we install the system.  Before we

21  schedule the tech out there before we sell you an alarm, we

22  have a validation department that goes over everything with

23  you runs, the information and does that.

24             The technician comes up -- the technicians

25  don't work in our office, we don't have our hand on them.



1   So I don't want that information floating around, but in

2   order to sell the contract to Monitronics, we have a

3   printed credit report we send up.  We put their social on

4   the contract and mail it to Monitronics.  So there is one

5   person that handles that seals it, mails it off and that's

6   it.  So nobody gets that information.

7        Q.      Did you ever have any past incidents where

8   personal information has been used?

9        A.      We've installed 15,000 customers and ran credit

10  on about 50,000.  Never an issue, this is the first

11  complaint.  If anybody ever said, oh, I didn't authorize

12  that, we would remove it, but that would be if we ran a

13  date of birth and a name and it pulled up a father or a

14  daughter.  We've maybe had that come up three or four times

15  in eight years.  That's never happened.

16       Q.      I showed you this document a few minutes ago.

17  This is the licensing enforcement complaint.  There is a

18  day-to-day narrative on this, and I'm going to ask you to

19  look at the date of 9/18/12.  Please read that part and let

20  me know when you are done.

21       A.      On this date -- do you want me to read it out

22  loud?

23       Q.      No, you don't have to read it out loud, just

24  whenever you are done reading.

25       A.      I've read it.



1      MR. NEWKIRK:  Hold on.

2      THE WITNESS:  That's not true.  Okay, I've read

3  it.

4  BY MR. MICHAUD:

5      Q.    I'm gathering by what you said that -- I guess

6  we'll get an answer, but in this last -- second paragraph, can

7  you just read the last two sentences aloud, please?  Second

8  to last paragraph, that is.

9      A.    Okay.  Mr. Waller stated upon receiving the

10  date of birth of the homeowner, ISI pulls the credit report

11  form which the Social Security is obtained.  The number is

12  placed on the contract when the homeowner either declines

13  to do so or forgets to do so.  Mr. Waller further stated

14  that it is preferred that ISI add the number because in

15  past incidence where such personal information had been

16  removed from ISI employee's vehicles during a burglary.

17      Q.    Is that what you were referring to that's not

18  true?

19      A.    I never said that.

20      Q.    I'm not asking you to speak for detective

21  Roubique, but why do you suppose he might have said

22  something like that?

23      A.    Been he's on a witch hunt since day one we went

24  into business in there.  Sounds like he took what I said

25  and twisted it.  Maybe he misunderstood me.



1    Q.    Why do you think he was on a witch hunt?

2    A.    He's made it crystal clear to me in several

3    conversations that he will shut down any company that does

4    business in Louisiana that does not live there or operate

5    there.  He's mentioned that to me many times as well as

6    some of my staff.

7    Q.    Describe one of the conversations that you have

8    had with him where he said that to you.

9    A.    When we first got licensed there, he mentioned

10   that he's ran other companies out of there before and

11   anybody has any mistakes, he runs out of out of there

12   immediately.  He doesn't like people doing business in his

13   state if they don't live there or if they don't operate out

14   of there with a home office.

15   Q.    This is the second to last page of the same

16   document.

17          Could you just read aloud where it says the

18   findings there?  On the second to last page.

19   A.    "Regarding the initial complaint information

20   and subsequent findings that ISI Alarms, Inc., did engage

21   in false, misleading or deceptive practices in the sale of

22   installation of residential security systems.  The deputy

23   finds the complaint to sustained."

24          MR. NEWKIRK:  Substantiated.

25          THE WITNESS:  Substantiated, there you go.



Case 2:12-cv-02873-EEF-KWR   Document 97-2   Filed 03/11/14   Page 14 of 33

WILLIAM JAYSON WALLER                                    July 29, 2013
GRICE vs. ISI ALARMS NC                                          32

1  BY MR. MICHAUD:

2      Q.      Were you aware of that?

3      A.      I was not, no.  I know we let her out of

4  contract.  I remember that, but we do that if there is an

5  issue anyways if someone complains.

6      Q.      Did ISI pay any fines to the Louisiana State

7  Fire Marshall for that specific complaint?

8      A.      I'm not sure.  We have a licensing department.

9  I'm not sure.

10     Q.      So you yourself didn't do any negotiations on

11 the fines?

12     A.      No.

13             (Whereupon, break taken.)

14 BY MR. MICHAUD:

15     Q.      Before we went off the record, I was asking

16 about the Louisiana State Fire Marshall licensing section

17 complaint that was filed against ISI.

18     A.      Uh-huh.

19     Q.      You had said that you weren't aware of a

20 complaint that was filed with respect to Ms. Grice's

21 allegations.  I'm just going to hand you this.

22             And tell me if you recognize that.

23     A.      I don't remember seeing it.

24     Q.      Can you identify what it is for the record,

25 Please?



WILLIAM JAYSON WALLER
GRICE vs. ISI ALARMS NC

July 29, 2013
39

1    aware of -- scratch that.

2              How many IP addresses are registered to ISI?

3        A.    I don't know.

4        Q.    Approximately?

5        A.    One or two.

6        Q.    And do you have any IT monitoring of your

7    employee's computer activities?

8        A.    Yes.

9        Q.    Who does that?

10       A.    Jacob Lyons.

11       Q.    What does he do, how does he monitor it?

12       A.    He locks every computer and filters out where

13   only like two and three computers in the company can visit

14   the Internet.  Everything else is just OnGuard or a couple

15   sites that they need.

16       Q.    So only two or three computers can access the

17   Internet?  Who has access to those computers?

18       A.    Myself, Kevin Klink and my wife.

19       Q.    Nobody else in the company can access the

20   Internet other than you three?

21       A.    That's correct.  We have it blocked on every

22   computer unless it's needed.  We allow certain websites

23   that they need for something, but it's very, very strict

24   and limited.

25       Q.    How about Yahoo?



WILLIAM JAYSON WALLER
GRICE vs. ISI ALARMS NC

July 29, 2013
40

1    A.    Yahoo wouldn't be approved.  There is no reason

2  to be on Yahoo.  We would do a deed check so you can verify

3  the homeowner, OnGuard and Google Maps to map out the date

4  for scheduling.  That's it.

5    Q.    Are you aware that a Yahoo E-mail address or

6  E-mail account was opened from an IP address that's

7  registered to ISI?

8    A.    I'm aware that's the allegation.  I don't

9  believe that, but I'm aware that's the allegation.

10    Q.    Why don't you believe it?

11    A.    It would be impossible for someone to do that

12  on a computer.

13    Q.    I'm handing you part of a document, and take a

14  look at that and tell me when you are finished.

15    A.    Okay.

16    Q.    Can you tell me what that is?

17    A.    It looks like a business records declaration

18  saying that the two pages -- someone activated a Yahoo

19  account management tool.

20    Q.    Can you tell me where the IP address that is

21  associated with that application for the E-mail address is?

22  Can you read that for the record, please?

23    A.    I don't know.  Oh, you want me to read --

24    Q.    Just the IP address, the number.

25    A.    64.128.73.90.



1    any information that I can find investigating this, yes.

2        Q.      But with respect to the specific responses to

3    discovery requests, you didn't participate in that?

4        A.      Certain things like --

5        Q.      Like interrogatories and request for production

6    of documents?

7        A.      Yes.  I responded to all of that, yes.  Me and

8    my made up words here.  George Bush, he's my hero.

9        Q.      I'm showing you a copy for this and mark that

10   for the record as 8.

11       A.      Okay.

12       Q.      Can you identify that for the record?

13       A.      That looks like a lawsuit from Cynthia Grice to

14   ISI Alarms NC, Inc.

15       Q.      What is the specific --

16       A.      And TransUnion.  What is the specifics?  It's

17   the answer of affidavit.  Is that what you are asking?  I

18   don't know what you are asking.

19       Q.      What is the title of this pleading?

20       A.      I'm still lost, sorry.  United States District

21   Court --

22       Q.      No, this.

23       A.      Answer of defendant ISI Alarms NC, Inc. to

24   plaintiff's request for admission.

25       Q.      So earlier when I asked you if you were

1   participating in the discovery requests, did you

2   participate in the answer to these?

3       A.      Yes.

4       Q.      I'm going through these, a few of these.  Let's

5   start with number 10.

6               Can you read the request and then your

7   response?

8       A.      "Please admit that an ISI employee entered

9   plaintiff's Social Security number on the alarm monitoring

10  agreement signed by Vincent Bennett.  Denied."

11      Q.      Is that true?

12      A.      No.  Someone would have added it and sent it to

13  Monitronics if that's the copy we have, yes.  So that would

14  be false.

15      Q.      The next one, can you read it as well?

16      A.      "Please admit ISI obtained a copy of

17  plaintiff's consumer credit report from TransUnion.

18  Admitted, yes."

19      Q.      And then the next one.

20      A.      "Please admit that ISI requested a copy of

21  plaintiff's consumer report from TransUnion.  ISI did not

22  have plaintiff's Social Security number."  That says

23  denied, but we didn't have it, we used her date of birth.

24  We got it after.

25      Q.      So it should have been admitted?



Case 2:12-cv-02873-EEF-KWR  Document 97-2  Filed 03/11/14  Page 19 of 33

WILLIAM JAYSON WALLER                                July 29, 2013
GRICE vs. ISI ALARMS NC                                        47

1    A.    Yes, I would assume so.  We pulled the credit

2  without it though.  We don't ever ask for socials.

3    Q.    Right.  Well, the request says, "Admit that

4  when ISI requested a copy of plaintiff's consumer report

5  from TransUnion, LLC, ISI did not have the plaintiff's

6  Social Security number."

7         And that is?

8    A.    We didn't when we obtained the report, but

9  after we got the report, we did.  So I guess that's maybe

10  the confusion of the question.  To get the credit report,

11  we did not have it.  After we got the credit report, we had

12  it.

13    Q.    So this is denied, but it should be admitted?

14    A.    I guess however the question states.  The way I

15  looked at it is, to me it asks, if we had it when we were

16  requesting the report, the answer is no.  Did we have it

17  after we get the report, yes.  We don't need it to pull the

18  credit report.

19    Q.    How about reading another one.  Read number 13

20    A.    "Please admit ISI obtained a copy of the

21  plaintiff's consumer report from TransUnion, LLC, without

22  providing plaintiff's Social Security to TransUnion."

23    Q.    And that answer is?

24    A.    Denied.

25    Q.    But it should be admitted; right?



WILLIAM JAYSON WALLER
GRICE vs. ISI ALARMS NC

July 29, 2013
48

1    A.    Well, we did it without the social, so it

2  should be admitted.  We pulled it with date of birth.

3    Q.    Why would you have denied all of these

4  requests?

5    A.    I just told you I might have read the question

6  incorrectly.  I read it as you needed it beforehand.

7    Q.    All right.  How about 14?

8    A.    "Please admit ISI obtained plaintiff's Social

9  Security number from TransUnion."  That would be admitted

10  when we sent it off, yes.

11    Q.    How come all of these were denied?  Were you

12  confused as to the answers -- the questions?  Excuse me.

13    A.    I guess so.  I don't know why it says denied.

14  It should have been admitted.

15    Q.    And number 15?

16    A.    "Please admit ISI added plaintiff's Social

17  Security to the alarm monitoring agreement signed by Mr.

18  Vincent Bennett after obtaining it from TransUnion.  That

19  should be admitted."

20    Q.    But it was?

21    A.    It says denied.

22    Q.    Did you see these before they were signed and

23  sent out?

24    A.    Yes.

25    Q.    Number 16?



Case 2:12-cv-02873-EEF-KWR   Document 97-2   Filed 03/11/14   Page 21 of 33

WILLIAM JAYSON WALLER                                      July 29, 2013
GRICE vs. ISI ALARMS NC                                              49

1       A.      "Please admit that Internet protocol address

2   64.128.73.90 is registered and/or owned by ISI.  Denied."

3       Q.      Should that be admitted?

4       A.      I don't know.  I don't know if that's really

5   our IP address.  I'd have to ask what's his name to look back

6   or call them myself.

7       Q.      Is the same number that appeared on the

8   declaration from TW Telecomm?

9       A.      Yes, but that's not our IP address in

10  Mooresville where that's where it's saying, or vice versa,

11  you know.

12              MR. MICHAUD:  Okay, let's mark that.

13              (Exhibit 8 marked for identification.)

14  BY MR. MICHAUD:

15      Q.      What is ISI's current status?

16      A.      It's out of business.

17      Q.      When did it go out of business?

18      A.      Third week of March.

19      Q.      Why did it go out of business?

20      A.      We weren't making money for about eight or nine

21  months straight, not enough sales, losing installers.  It

22  just wasn't profitable as it was before.

23      Q.      What do you think changed?

24      A.      I don't know.  Eight or nine months, we

25  couldn't hire people like we thought we could.  We got



WILLIAM JAYSON WALLER
GRICE vs. ISI ALARMS NC

1  burned by a couple vendors, bad deals, chargebacks, we have

2  guaranteed contracts.  A lot of those Chargebacks from

3  Monitronics hit us while we were upside down.  We owed them

4  more than we were selling, so we were upside down.

5      Q.    So the company was losing money?

6      A.    Yes, since October '12 until we shut down, we

7  were losing money.

8      Q.    Why was --

9            MR. NEWKIRK:  October 2012?

10           THE WITNESS:  Yes, October 2012 to March we

11      were losing money.

12  BY MR. MICHAUD:

13      Q.    Why wasn't the company put through bankruptcy?

14           MR. NEWKIRK:  Objection.

15  BY MR. MICHAUD:

16      Q.    The objection is for the record.  You can still

17  answer.

18           MR. NEWKIRK:  If you can.  And I'll instruct

19      you not to answer because it deals with the advice of

20      counsel, so it's attorney client/privilege.

21  BY MR. MICHAUD:

22      Q.    What is the state of ISI's balance sheet

23  presently?

24      A.    About $2,000 in the account.

25      Q.    About how much liabilities?

Case 2:12-cv-02873-EEF-KWR   Document 97-2   Filed 03/11/14   Page 23 of 33

WILLIAM JAYSON WALLER                                July 29, 2013
GRICE vs. ISI ALARMS NC                                        51

1      A.      Liabilities, like what do you mean?

2      Q.      Existing liabilities.  I don't mean like

3  potential future liabilities.  I mean like existing

4  liabilities?

5              THE WITNESS:  Does that mean like a bill owed?

6              MR. NEWKIRK:  Yes.

7              THE WITNESS:  About $550,000.

8  BY MR. MICHAUD:

9      Q.      Have you ever been a CEO of any other company

10  besides ISI?

11     A.      No.

12     Q.      You had said earlier that you were chief

13  operating officer for Power Home Technologies; is that

14  correct?

15     A.      Yes.

16     Q.      Will you describe your job duties with that

17  job?

18     A.      Just running the day-to-day operations,

19  technicians installs, equipment inventory, hiring folks for

20  our customer service department.

21     Q.      Differentiate that from your former role as

22  ISI's CEO, if you can?

23     A.      I did everything.  I owned the whole company.

24  I hired, trained, sold deals, responsible for everything.

25     Q.      So what do you not do now that you used to do



1    at ISI?

2        A.      Almost everything, because now I'm more just

3    over operations.  I handle technicians and equipment

4    inventory now.  Before I ran A to Z in the company.

5        Q.      What kind of company is Power Home

6    Technologies?

7        A.      Home security company, a structured wiring

8    company, home automation company.  What else?  A CCTV

9    company.

10       Q.      And how is it different from ISI?

11       A.      It has door knockers, it has 15 branches

12   nationwide, has agreements with builders, does a lot of

13   wiring.  All of the technicians are employees.  It's just

14   it's --

15       Q.      Do you have any day-to-day accounting and/or

16   bookkeeping responsibilities in your current role?

17       A.      No.

18       Q.      I'm trying to be delicate, so forgive me.

19       A.      I got it.

20       Q.      What do you see as the future of ISI, if any?

21       A.      I have no idea.

22       Q.      Why is ISI still considered a going concern at

23   the Secretary of States Office?

24       A.      Just haven't filled out the paperwork yet, you

25   know, trying to close-up loose ties, anything that's out



Case 2:12-cv-02873-EEF-KWR  Document 97-2  Filed 03/11/14  Page 25 of 33

WILLIAM JAYSON WALLER                                    July 29, 2013
GRICE vs. ISI ALARMS NC                                           53

1   there pending.  We have in-house account customers we are

2   trying to let out of contract that we didn't sell, things

3   like that, wrapping up things.

4       Q.    Do you still have potential buybacks from

5   Monitronics?

6       A.    No.  We settled with Monitronics, so I don't

7   owe them anything, they don't owe us anything.

8       Q.    So let's say, for example, some customer that

9   you sold a system to six months ago wants to let out or

10  they stop paying or for whatever reason, wouldn't that

11  trigger a buyback?

12      A.    No, I cancelled my contract with Monitronics.

13      Q.    Can you describe your contract with

14  Monitronics?

15      A.    I was selling them contracts.  We were a dealer

16  for them.  Kind of like you got a car dealership selling,

17  same thing, same concept.

18      Q.    So when you say you cancelled your contract

19  with them you stopped selling them contracts?

20      A.    We quit selling them contracts, and we were

21  upside down so they shut the dealership down.

22      Q.    But then, from what you said earlier on, there

23  was still a potential because you had to guarantee

24  contracts for 12 months; isn't that correct?

25      A.    I did, but because we were upside down, they



1   just let me walk.  They had a thing called holdback, they

2   keep a percentage.  They are going to keep all of that.  I

3   get none of that to pay for future stuff.

4          Q.      Just like car dealers?

5          A.      Exactly.

6          Q.      So in exchange for forgoing the holdback, they

7   let you guys out, you guys separated, that was it?

8          A.      Yes.

9          Q.      I have nothing further, actually.

10              MR. NEWKIRK:  Let me just check on one thing.

11          (Whereupon, discussion had off the record.)

12                        EXAMINATION

13   BY MR. NEWKIRK:

14          Q.      All right.  Let me just ask a couple of

15   questions to clarify a couple of points.  Let's first start

16   with the request for admissions.

17              When these responses were returned back,

18   particularly to questions 10, 12, 13, 14 and 15, do you

19   have an explanation as to why those response at that time

20   were denied as opposed to admitted?

21          A.      We weren't sure of the answers on how we pulled

22   the socials, like who is responsible of putting it on

23   there, if it was done by funding, or if we looked at the

24   contract to see if the customer actually put it on there.

25   As well as if sometimes if we pull a date of birth and

1   someone says we can't pull anything, theyll give us a

2   social over the phone.  So we had to pull the recordings to

3   see if anybody pulled the credit with the social over the

4   phone instead of the date of birth.  So we weren't sure of

5   the answers on there, that's why it would be denied.  So we

6   were still uncertain of the answers before the time due.

7        Q.     So in terms of when you were talking to Mr.

8   Michaud about the standard procedure, were you sure at the

9   point that these responses were sent back, that you had

10  either followed the standard procedure or that there was

11  deviation?

12       A.     Well, I wasn't sure yet.  That's why I want to

13  investigate them further and give those answers until I

14  knew more.

15       Q.     When did ISI move from Concord to Mooresville?

16       A.     May 15th.

17       Q.     Of what year?

18       A.     2012.

19       Q.     I believe earlier we were talking about the

20  dates of the experiences or the communication with Ms.

21  Grice.  Can you tell us what the dates were that the

22  communications with her started?

23       A.     Yes.  So we signed her up or signed him up in

24  April and installed it.  Signed up everything April 16th,

25  installed it April 19th.  And we were in communication with



1  her in June 1st all the way to July 3rd was the last note I

2  had on that account.

3      Q.    So in April who is your IP provider?

4      A.    My Connection.

5      Q.    No.

6      A.    I'm sorry, Time Warner was in April.

7      Q.    Because you were in what address?

8      A.    Concord.

9      Q.    So in May who was your --

10     A.    My connection.

11     Q.    And the information that is provided to you on

12  Exhibits 6 and 7 indicates that the information was

13  obtained apparently as of July 26th.

14          Who is your provider, IP provider in July of

15  2012?

16     A.    My Connection.

17     Q.    So do you have any knowledge or any idea

18  whether the same IP address transferred from Time Warner to

19  My Connection?

20     A.    I wouldn't know.  I'm going to ask the IT guy,

21  but I'm not sure.

22     Q.    Okay.  Did you have the same level of security

23  reaching the Internet in the Concord office that you had in

24  the Mooresville office?

25     A.    We have even more strict security in



 1   Mooresville.

 2       Q.     So stricter in Mooresville than it was in

 3   Concord?

 4       A.     Yes.

 5       Q.     And then just lastly with regard to your

 6   communications, there was some confusion about whether or

 7   not you had been in communication.  I guess the original

 8   question was, were you aware of actions by governmental

 9   agencies against the company.  And I think your original

10   answer might have been no, and then Marc brought to your

11   attention communications with Ricky Roubique and the State

12   Fire Marshall's Office in Louisiana.

13           Had you had communications with them prior to

14   their being investigations with Ricky Roubique?

15       A.     Yes.

16       Q.     About what?

17       A.     Licensing, how to get licensed, outside

18   companies coming in, things like that.

19       Q.     So if you had -- if there was some confusion

20   about your communication with Ricky Roubique before the

21   allegations from Ms. Grice and afterwards, can you explain

22   that as going toward or being related to the fact that you

23   had had regular communications with him and there was no

24   distinction between them?

25       A.     Yes.  When I spoke to him on the phone, he



1   wouldn't mention, this is an investigation, I need this

2   information.  He'd ask questions.  He would be like, hey,

3   what's going on with this, I've got this.  It was very

4   informal and I would let him know I wouldn't know.  He

5   would tell me on the phone -- he wouldn't mention that it's

6   an ongoing -- he wouldn't mention the details or how big of

7   a deal this is because we spoke all of the time.  It seemed

8   informal.

9        Q.    Okay.  I have no further questions.

10

11            MR. NEWKIRK:  Are you done?

12                  FURTHER-EXAMINATION

13   BY MR. MICHAUD:

14        Q.    Just indulge me just quickly.  One of the

15   things that I thought about that I wanted to ask you was

16   the existence of insurance policies?

17            MR. NEWKIRK:  Not related to cross.

18            MR. MICHAUD:  No.  May I?

19            MR. NEWKIRK:  In very limited fashion, yes.

20   BY MR. MICHAUD:

21        Q.    What type of insurance does or did ISI maintain

22   for errors and omission and that type of thing?

23        A.    I honestly don't know offhand.  I didn't handle

24   that.  I know we don't have one now, I cancelled

25   everything, but I didn't handle that.  We never used it for



1    anything, never had a complaint on it.

2        Q.    Are you aware that in our request for

3    production of documents we asked for copies of insurance

4    policies that may or may not have related to the matters at

5    issue in this lawsuit?

6        A.    I wasn't aware of that.

7        Q.    That's it.

8        (Whereupon, the deposition concluded at 2:27 p.m.)

9                    (Signature waived.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



60

1   STATE OF NORTH CAROLINA
    COUNTY OF MECKLENBURG

2

3                   REPORTER'S CERTIFICATE

4       I, Justin Davis, a Notary Public, to hereby certify

5   that there came before me on Monday, July 29, 2013, the

6   person hereinbefore named who was by me duly sworn to

7   testify to the truth and nothing but the truth of his or

8   her knowledge concerning the matters in controversy in this

9   cause; that the witness was thereupon examined under oath,

10  the examination reduced to typewriting under my direction,

11  and the deposition is a true record of the testimony given

12  by the witness.

13      I further certify that I am neither attorney or

14  counsel for, nor related to, or employed by any attorney or

15  counsel employed by the parties hereto or financially

16  interested in the action.

17      IN WITNESS WHEREOF, I have hereto set my hand this

18  29th day of July, 2013.

19

20      Justin Davis, Notary Public
        Notary Public Number 201311300060

21

22

23

24

25