UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CYNTHIA GRICE** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 12-2873** |
| | * | |
| **ISI ALARMS NC, INC.** | * | **SECTION "L" (4)** |

## ORDER AND REASONS

Before the Court are two motions for partial summary judgment filed by Plaintiff Cynthia Grice and Defendant Scottsdale Insurance Company, respectively. (Rec. Docs. 97, 99). The Court has reviewed the briefs and the applicable law and, having heard oral argument on the motions, now issues this Order and Reasons.

**I.    Background**

This case arises out of an alleged violation of the Fair Credit Reporting Act. On November 14, 2013, Plaintiff Cynthia Grice filed a Second Amended Complaint. (Rec. Doc. 78). According to Grice, she owns a home in Amite, Louisiana that is occupied by her elderly father. Grice claims that someone working for Defendant ISI Alarms NC, Inc. ("ISI Alarms") called her father and convinced him to purchase an alarm system for the house. (Rec. Doc. 78 at 3). Grice claims that when the ISI technician installed the alarm system in the house, he asked her father to sign two documents. Grice claims that the ISI technician told her father to sign her signature, since she was the owner of the property. Grice alleges that ISI Alarms obtained her credit report, using her date of birth, and got her social security number from the credit report. (Rec. Doc. 97-1 at 2). Grice claims that this was ISI Alarms' routine policy. (Rec. Doc. 78 at 8). Further, Grice claims that ISI Alarms used her social security number and a fake e-mail address with her name to apply for credit cards. (Rec. Doc. 78 at 6).

1

According to Grice, she filed several complaints with the Tangipahoa Parish Sheriff's Office ("TPSO"), the State Fire Marshall, and the Louisiana Attorney General.  Grice claims that Deputy Roubique, with the State Fire Marshall's office, discovered through his investigation that the IP address that was used to apply for credit in Grice's name was subscribed to ISI Alarms.  (Rec. Doc. 78 at 7).  Because ISI Alarms allegedly obtained Grice's consumer report without any permissible purpose, Grice alleges that ISI Alarms knowingly, wilfully, and/or negligently failed to comply with the requirements of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681(b)(f)(1) and 1681 (q), and is liable for damages and attorney fees.  Grice also alleges that ISI Alarms is liable for fraud, intentional infliction of emotional distress, and invasion of privacy. In his deposition testimony, ISI Alarms' former CEO William Jayson Waller admitted that it was common practice to obtain a customer's credit report using the customer's date of birth and then get the customer's social security number off of the credit report.  (Rec. Doc. 51-8 at 18-19). Mr. Waller also admitted that ISI Alarms added Grice's social security number to the alarm monitoring agreement.  (Rec. Doc. 51-8 at 20).

On September 19, 2013, this Court entered a consent judgment in favor of Grice and against ISI Alarms in the amount of $100,000.00.  (Rec. Doc. 64).  On September 23, 2013, Grice filed a motion to vacate the consent judgment.  Grice claims that the day after she agreed to the consent judgment, she discovered that ISI Alarms had an insurance policy provided by Defendant Scottsdale.  (Rec. Doc. 78 at 9).  Grice claims that her decision to agree to the consent judgment was based on information provided by Mr. Waller that no insurance coverage existed. On November 6, 2013, this Court vacated the consent judgment and re-opened the case.  (Rec. Doc. 77).  Grice subsequently filed the Second Amended Complaint, adding Defendant Scottsdale to the lawsuit.  Grice added a direct insurance claim against Scottsdale.  (Rec. Doc.

2

78).

## II. Present Motions

Grice and Scottsdale now file cross-motions for summary judgment on the issue of insurance coverage. (Rec. Docs. 97, 99). Because both motions deal with the same issues, the Court will discuss them together.

### A. Scottsdale's Motion for Partial Summary Judgment and Opposition to Grice's Motion (Rec. Docs. 99, 100)

First, Scottsdale argues that North Carolina law governs the issue of insurance coverage. (Rec. Doc. 99-1 at 7). According to Scottsdale, Louisiana choice-of-law rules require this Court to consider where the policy was negotiated, issued, and delivered. Since those events all took place in North Carolina, Scottsdale argues that North Carolina has the greater interest in the interpretation of the insurance policy, and, therefore, this Court should use North Carolina law. (Rec. Doc. 99-1 at 8). Scottsdale claims that courts in North Carolina apply the "comparison test" to determine if the insurer has a duty to defend the insured in a lawsuit. (Rec. Doc. 99-1 at 9). The courts read the insurance policies and the complaint side-by-side to determine if the events, as alleged, are covered. Scottsdale claims that the initial burden is on the plaintiff to allege and prove coverage. If the plaintiff satisfies this burden, the burden then shifts to the insurer to prove the applicability of an exclusion. (Rec. Doc. 99-1 at 9). Scottsdale argues that Grice has not satisfied the initial burden.

According to Scottsdale, the insurance policy's Coverage A covers payments for "bodily injury" and "property damage" that were caused by an "occurrence." (Rec. Doc. 99-1 at 9-10). Scottsdale claims that "property damage" means physical injury to tangible property and that Grice has not alleged such damage. Similarly, Scottsdale argues that Grice has alleged no "bodily injury" as it is defined in the policy. (Rec. Doc. 99-1 at 10-11). Furthermore, Scottsdale

argues that no "occurrence" took place because the policy defines occurrence as an accident, yet the evidence indicates that the alleged actions in this case were intentional. (Rec. Doc. 99-1 at 12). Scottsdale also argues that even if Grice's claims were covered, they would be excluded by various policy exclusions. Specifically, Scottsdale claims that the "Recording and Distribution Exclusion," the "Personal and Advertising Injury Exclusion" and the "Expected or Intended Injury Exclusion" all apply to Grice's claims. (Rec. Doc. 99-1 at 15-17). Most significantly, the "Recording and Distribution Exclusion" precludes coverage for bodily injury or property damage "arising directly or indirectly out of any action or omission that violates or is alleged to violate … The Fair Credit Reporting Act (FCRA) …." (Rec. Doc. 97-3 at 25).

Scottsdale also argues that the insurance policy's Coverage B does not cover Grice's claims. According to Scottsdale, Coverage B covers "personal and advertising injury," which is defined in the policy. (Rec. Doc. 99-1 at 17). The definition describes seven offenses that can cause this type of injury, one of which is "[o]ral or written publication, in any manner, that violates a person's right of privacy." (Rec. Doc. 99-1 at 18) (citing Rec. Doc. 97-3 at 14). Scottsdale argues that the only one of Grice's claims that could potentially be covered by this provision is her cause of action for invasion of privacy. However, Scottsdale points out that Coverage B also includes a "Recording and Distribution Exclusion" that precludes coverage for claims under the FCRA. (Rec. Doc. 99-1 at 19). Further, Scottsdale argues that the policy's "Material Published with Knowledge of Falsity" exclusion precludes coverage for Grice's claim that ISI Alarms used her credit information to complete false credit applications. (Rec. Doc. 99-1 at 19).[1]

---

[1] Scottsdale also briefly argues that the policy's Errors and Omissions Coverage does not cover Grice's claims. Grice did not respond to this argument and neither party mentioned it during oral argument. Therefore, the Court finds it unnecessary to address this.

4

     **B.    Grice's Motion for Partial Summary Judgment and Opposition to Scottsdale's Motion (Rec. Docs. 97, 101)**

Grice urges this Court to interpret the insurance policy using Louisiana law. According to Grice, Louisiana has the greatest interest in the litigation because it has an interest in protecting its citizens and the injury took place in Louisiana. (Rec. Doc. 101 at 2).

Grice argues that Scottsdale has a duty to defend ISI Alarms in this lawsuit. According to Grice, an insurer has a duty to defend an insured who is a party to a lawsuit, unless the policy unambiguously precludes coverage for all of the allegations made in the complaint. (Rec. Doc. 97-1 at 7-8). Grice claims that the allegations made in her complaint are not unambiguously precluded. Applying Louisiana law, Grice argues that ISI Alarms' actions constitute an "occurrence" as defined in Coverage A. Grice argues that in Louisiana, the occurrence clause only precludes coverage of damages that were specifically intended, not all damages that result from intentional acts. Grice argues that while ISI Alarms' actions were intentional, they were not specifically calculated to cause the damage that they caused. (Rec. Doc. 101 at 5).

Grice also addresses the policy's exclusions. Grice acknowledges that the policy excludes coverage for claims arising out of violations of the FCRA. However, Grice argues that even assuming that some of her claims are excluded by the FCRA exclusion, she has stated other viable state-law claims that are not excluded. (Rec. Doc. 97-1 at 10). For instance, Grice claims that the Louisiana Constitution contains a provision that protects certain expectations of privacy surrounding citizens' private credit information. (Rec. Doc. 97-1 at 10). Grice points out that she also made claims for fraud and intentional infliction of emotional distress. Grice also acknowledges that the policy specifically excluded coverage for "'bodily injury' or 'property damage' expected or intended from the standpoint of the insured." (Rec. Doc. 97-1 at 11) (citing Rec. Doc. 97-3 at 10). Grice claims that this exclusion only applies when both the action *and* the

5

injury were intended. Grice argues that here none of the intentional conduct was intended to specifically harm Grice. Therefore, Grice argues that the exclusion does not apply. (Rec. Doc. 97-1 at 12). Further, Grice argues that the "Material Published with Knowledge of Falsity" exclusion does not apply because ISI Alarms did not publish false information, but instead accurate information. (Rec. Doc. 101 at 6).

### III.     Law and Analysis

#### A.     Standard

Summary Judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id*. When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). Both parties agree that there are no factual disputes in this case. The only question is whether the insurance policy provided by Scottsdale covers this lawsuit.

#### B.     Choice of Law

The Louisiana choice-of-law rules applicable to insurance contracts are found in Louisiana Civil Code article 3537 and Louisiana Civil Code article 3515. These statutes provide:

6

> Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

La. Civ. Code art. 3537; and

> Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

La. Civ. Code art. 3515.  Under Louisiana law, "the law of the state where the insurance contract was issued and executed generally governs the interpretation of that contract." *American Elec. Power Co. Inc. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 285 n. 2 (5th Cir. 2009); *see also Morad v. Aviz*, 2013 WL 1403298 (E.D. La. Apr. 5, 2013) (applying Mississippi law and explaining that "Mississippi is the domicile of the insured and the state where the policy was sold, negotiated, and issued.  Further, the [insurance] agent's office is located in Mississippi.  Louisiana law may apply to the underlying construction contract between Aviz and Morad, but it is the insurance policy between Nationwide and Aviz that is at issue.").

7

In this case, ISI Alarms' principal place of business was in Mooresville, North Carolina. (Rec. Doc. 97-5 at 4). Scottsdale issued a commercial general liability insurance policy to ISI Alarms, which was negotiated in North Carolina and delivered to ISI Alarms at its place of business in North Carolina. (Rec. Doc. 99-2 at 1-2). While Grice correctly states that the injury that she suffered took place in Louisiana, the Court does not find this fact conclusive. The pertinent issue in this case is the applicability of an insurance policy. Looking at all of the facts in this case, this insurance coverage dispute involves significant contacts with North Carolina. Therefore, this Court will use North Carolina law in interpreting the coverage of the insurance policy.

    **C.**    **Policy Coverage**

"In an action to recover under [an] insurance policy, the burden is on the plaintiff to allege and prove coverage. On the other hand, the burden of showing an exclusion from coverage is on the insurer." *Brevard v. State Farm Mut. Auto. Ins. Co.*, 137 S.E.2d 837, 839 (N.C. 1964). In North Carolina, courts apply the "comparison test" to determine if an insurer has a duty to defend the insured. The courts "read[] the policies and the complaint 'side-by-side … to determine whether the events as alleged are covered or excluded." *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, LLC*, 692 S.E.2d 605, 610 (N.C. 2010). The court is to assume that all of the facts alleged in the complaint are true and compare them to the language of the insurance policy. *Id.* at 611. "[E]ven a meritorious allegation cannot obligate an insurer to defend if the alleged injury is not within, or is excluded from, the coverage provided by the insurance policy." *Id.* at 611 (citing *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374 (N.C. 1986)). Significantly, the focus should be on the facts that are pled, not how the claims are characterized. *Holz-Her U.S., Inc. v. U.S. Fidelity and Guar. Co.*, 539 S.E.2d 348, 350 (N.C. Ct.

App. 2000) (citing *Eubanks v. State Farm Fire and Casualty Co.*, 126 N.C. App. 483, 488-89 (N.C. Ct. App. 1997)). Accordingly, this Court must analyze the facts alleged in Grice's complaint rather than the legal causes of action that she lists.

In interpreting an insurance policy, the goal of the court is to "arrive at the insurance coverage intended by the parties when the policy was issued." *Harleysville*, 692 S.E.2d at 612 (quoting *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970)). If the language of the policy is unambiguous, meaning that it is "not 'fairly and reasonably susceptible' to multiple constructions, then [the court] 'must enforce the contract as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay.'" *Id.* On the other hand, the Court should resolve any ambiguity in the words of an insurance policy against the insurance company. *Id.* at 612; *see also North Carolina Farm Bureau Mut. Ins. Co. v. Stox*, 412 S.E. 2d 318, 325 (N.C. 1992) ("It is also well settled that when an insurance policy contains no ambiguity, it shall be construed according to its terms, but when ambiguity exists the policy shall be construed in favor of coverage and against the insurer who selected its language.").

    1. *Coverage A*

Coverage A of the Scottsdale insurance policy covers "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Rec. Doc. 97-3 at 9). The policy goes on to explain that "[t]his insurance applies to 'bodily injury' and 'property damage' only if: (1) the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.'" (Rec. Doc. 97-3 at 9).

9

a.  Property Damage

According to the policy, "[p]roperty damage" is defined as "physical injury to tangible property, including all resulting loss of use of that property" and "loss of use of tangible property that is not physically injured." (Rec. Doc. 97-3 at 23). In Grice's complaint, she alleges that she suffered "actual damages, including lost opportunity to receive credit, damage to reputation, invasion of privacy, interference with her normal and usual activities and emotional distress …." (Rec. Doc. 78 at 10). In her motion for summary judgment, Grice claims that "damage to one's reputation constitutes 'property damage' for purposes of insurance coverage …." (Rec. Doc. 97-1). Grice cites a case from the Louisiana Third Circuit Court of Appeals for this argument. However, in *DeLoach v. HGI Catastrophe Services, L.L.C.*, the United States Court of Appeals for the Fifth Circuit held that under Louisiana law "[o]ne's reputation is not tangible property, and the purely economic losses resulting from damage thereto are not 'property damage' within the meaning of the policy." 460 Fed. Appx. 314, 317 (5th Cir. 2012). Similarly, no North Carolina courts have held that damage to one's reputation constitutes property damage. Furthermore, the Court reaches a similar conclusion through a straightforward application of the comparison test. Nowhere in Grice's complaint does she allege that any tangible property was physically injured or that she lost the ability to use such property. Accordingly, Grice has not alleged property damage that would be covered by the policy.

b.  Bodily Injury

According to the policy, "[b]odily injury" means "bodily injury, sickness or disease sustained by a person, including death …." (Rec. Doc. 97-3 at 21). Grice claims that "'bodily injury' includes humiliation, extreme and keen mental anguish and pain." (Rec. Doc. 97-1). Again, Grice cites a case from the Louisiana Third Circuit for this argument.

Under North Carolina law, it is unclear whether emotional distress can constitute bodily harm. In *American Manufacturers Mutual Insurance Company v. Morgan*, the Court of Appeals of North Carolina spoke to this question. 556 S.E.2d 25 (N.C. Ct. App. 2001). The court affirmed a trial court judgment in favor of the insurers. *Id.* The court explained:

> Defendant has failed to allege any injury arising out of any one of the offenses listed under "personal injury." With respect to "bodily injury," the trial court found that "Martha['s] … alleged humiliation, mental anguish and injuries to her feelings and her health, as alleged … and the claims for alienation of affection and criminal conversation … do not present claims for 'bodily injury' as that term is defined … in the [insurance policy]"

*Morgan*, 556 S.E.2d at 30. After a "careful review of the entire record," the court upheld the trial court's finding. On the other hand, in *Fieldcrest Cannon, Inc. v. Fireman's Fund Insurance Company*, the same Court of Appeals of North Carolina stated that "[t]he courts of this jurisdiction have recognized the torts of negligent infliction of emotional distress and intentional infliction of emotional distress as actions for bodily injury." 477 S.E.2d at 71 (N.C. Ct. App. 1996). The court in *Fieldcrest* cited the Supreme Court of North Carolina's opinion in *Johnson v. Ruark Obstetrics and Gynecology Associates, P.A.* as "reiterating that 'the mind is no less a part of the person than the body, and the sufferings of the former are sometimes more acute and lasting than those of the latter. Indeed, the sufferings of each frequently, if not usually, act reciprocally on the other.'" *Id.* (quoting *Johnson*, 392 S.E.2d 85, 90 (N.C. 1990)). However, a close examination of the holding in *Johnson* reveals that the North Carolina Supreme Court held that a plaintiff could bring a claim for intentional and negligent infliction of emotional distress even when the distress was not accompanied by a physical injury. *Johnson*, 392 S.E.2d at 79. The *Johnson* court did not go so far as to say, as the *Fieldcrest* court claimed, that a cause of action for emotional distress is an action for bodily injury.

11

As is made clear from these cases, the law in North Carolina regarding whether emotional distress can constitute bodily injury is unsettled. This Court, however, does not find it necessary to resolve this question because, as explained below, other provisions and exclusions included in Coverage A of the policy resolve the issues presented here.

        c.    Occurrence

The policy defines occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Rec. Doc. 97-3 at 22). The Court of Appeals of North Carolina, interpreting an identical insurance provision, explained that "[a]ccording to its ordinary meaning, an accident is 'an unforeseen event, occurring without the will or design of the person whose mere act causes it; an unexpected, unusual, or undesigned occurrence.'" *Holz-Her U.S., Inc. v. U.S. Fidelity and Guar. Co.*, 539 S.E.2d 348, 350 (N.C. Ct. App. 2000) (quoting *Waste Mgmt.*, 340 S.E.2d at 379). The court further explained that "[w]hether injuries are accidental and thus satisfy the definition of an 'occurrence' depends upon whether they were expected or intended from the insured's point of view." *Id.* (citing *Waste Mgmt.*, 340 S.E.2d at 380). The focus should be on the injury and whether that injury was intended or substantially certain to occur. *Id.* (citing *Washington Housing Auth. v. N.C. Housing Auth.*, 502 S.E.2d 626, 630 (1998)).

Applying this test, the court in *Holz-Her U.S., Inc. v. United States Fidelity and Guaranty Company* found that the lawsuit in question did not involve an "occurrence" as defined in the general liability insurance policy. *Id.* at 350. In that case, Holz-Her U.S., Inc. ("Holz-Her") agreed to lease equipment to South Bay, a newly-formed company. Relying on that agreement, South Bay negotiated further contracts with other companies to construct buildings needed to house the leased equipment and borrowed $880,000 as a result. *Id.* Ultimately, Holz-Her

12

refused to lease the equipment and South Bay's owner was forced to sell off his majority ownership in order to pay off the $880,000 loan. *Id.* South Bay was also forced to lease the equipment elsewhere, which caused delays. *Id.* The Court of Appeals held that these factual allegations did not involve an "occurrence." Instead, the court found that the injuries alleged were expected or substantially certain to occur as a result of Holz-Her's refusal to lease the equipment. *Id.* at 351. The court explained that because Holz-Her's alleged misrepresentation was substantially certain to cause business injuries to South Bay, the court could "infer an intent to injure as a matter of law." *Id.*

Like in *Holz-Her*, the alleged actions of ISI Alarms were substantially certain to cause Grice's alleged injuries. Grice claims that ISI Alarms obtained her credit report without her knowledge or permission and then used that report to apply for credit in Grice's name. *See* (Rec. Doc. 78 at 9). As a result of these actions, Grice alleges that she suffered damage to her credit and reputation, invasion of privacy, and emotional distress. ISI Alarms' alleged conduct was substantially certain, if not intended, to cause the injuries that Grice suffered. Accordingly, no "occurrence" was alleged by Grice and therefore, Grice has failed to establish that her injuries were covered by Coverage A of the policy.

### 2. *Coverage B*

Coverage B of the insurance policy covers "those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." (Rec. Doc. 97-3 at 14). The definition of "[p]ersonal and advertising injury" that is relevant in this case is "injury, including consequential 'bodily injury', arising out of … oral or written publication, in any manner, of material that violates a person's right of privacy." (Rec. Doc. 97-3 at 22). Grice alleges that ISI Alarms obtained her credit report and, using her social

13

security number, applied for credit in her name. (Rec. Doc. 78 at 9). She alleges that this conduct resulted in an impermissible invasion of privacy. Because the relevant portion of Coverage B only covers "oral or written publication," the alleged act of obtaining Grice's credit report is not covered by this provision. However, the alleged act of using Grice's credit report to complete credit applications in her name may be considered written publication that invaded Grice's privacy. Accordingly, Coverage B covers some of the allegations in Grice's complaint.

a. Exclusions

Having found that Coverage B covers Grice's allegations, the burden shifts to Scottsdale to prove that an exclusion contained in the policy applies and excludes coverage.

Coverage B contains an exclusion entitled "Material Published with Knowledge of Falsity," which excludes coverage for "'personal and advertising injury' arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity." (Rec. Doc. 97-3 at 14). The United States Court of Appeals for the Fourth Circuit has explained that the term "'false' is generally understood to mean ''untrue' or failing to correspond to a set of known facts.'" *State Auto Prop. and Cas. Ins. Co. v. Travelers Indem. Co. of Am.,* 343 F.3d 249, 260 (4th Cir. 2003) (quoting *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1195 (11th Cir. 2002)). In *State Auto Property and Casualty Insurance Company v. Travelers Indemnity Company of America*, the Fourth Circuit found that a similar falsity exclusion did not apply to misleading website information. The court, emphasizing that North Carolina law directs courts to construe insurance policy provisions in favor of coverage, explained that nothing on the defendant's websites was alleged to be "untrue." Rather, the plaintiff alleged that the websites gave a false impression to visitors by leading them to believe that the websites were associated with plaintiff's company. *Id.* at 260. The court stated that "[a]s the Eleventh Circuit observed,

14

although 'a court *could* construe the term 'false' to encompass conduct or statements arguably giving rise to a false or misleading impression, . . . such a definition . . . is significantly broader than one including only direct assertions of untrue facts, and [it is] no more plausible." *Id.* (citing *Hyman*, 304 F.3d at 1196). Just like in *State Auto Property*, the information that Grice alleges that ISI Alarms used to apply for credit in her name was not untrue. Instead, the information was true information about her but used in a way that was intended to mislead. According to the court's explanation in *State Auto Property*, this information is not excluded under the Material Published with Knowledge of Falsity exclusion.

Coverage B also contains an exclusion entitled "Criminal Acts," which provides that the insurance policy does not apply to "'personal and advertising injury' arising out of a criminal act committed by or at the direction of the insured." (Rec. Doc. 97-3 at 14). In the present case, Grice alleges that ISI Alarms used the information from her credit report to open e-mail addresses and apply for credit in her name. Fraud, by mail or wire, is criminal behavior. *See* 18 U.S.C. §§ 1341, 1342, 1343. Since Grice alleges that ISI Alarms was involved in this criminal behavior, her claims regarding the false credit applications are excluded under the Criminal Acts exclusion.

   3. *Recording and Distribution of Material or Information in Violation of Law Exclusion*

While the Court has found that all of Grice's claims are either not covered or are excluded, it is still important to mention the policy's "Recording and Distribution of Material or Information in Violation of Law Exclusion." Both Coverage A and Coverage B contained identical exclusions, which provided that the insurance policy did not apply to bodily injury, property damage, or personal and advertising injury "arising directly or indirectly out of any action or omission that violates or is alleged to violate . . . The Fair Credit Reporting Act

15

(FCRA)." (Rec. Doc. 97-3 at 25). The heart of Grice's complaint was that ISI Alarms knowingly, willfully, and/or negligently failed to comply with the FCRA when it obtained her credit report without any permissible purpose. These claims are explicitly and unambiguously excluded from coverage under the Scottsdale insurance policy.

**IV.     Conclusion**

For the foregoing reasons, **IT IS ORDERED** that Scottsdale's motion for summary judgment on the issue of insurance coverage is **GRANTED.**

**IT IS FURTHER ORDERED** that Grice's motion for summary judgment is **DENIED**.

New Orleans, Louisiana, this 21st day of April, 2014.

_____
UNITED STATES DISTRICT COURT JUDGE